**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF
AMERICA,
  *Plaintiff-Appellee*,

v.

DAVID A. LITWIN,
  *Defendant-Appellant.*

Nos. 17-10429
18-10279
18-10322
19-10007

D.C. No.
2:11-cr-00347-KJD-CWH-2

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted March 23, 2020
San Francisco, California

Filed August 27, 2020

Before: Ronald M. Gould, Morgan Christen, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress

# SUMMARY[*]

---

## Criminal Law

The panel vacated David Litwin's convictions and sentence for conspiracy to distribute a controlled substance and eight counts of distribution of a controlled substance, and remanded for a new trial, in a case in which the panel confronted the question whether a district court erred in dismissing a juror, hours into jury deliberations following a lengthy criminal trial.

Under the unique facts of this case, and notwithstanding the substantial resources expended, the panel was constrained to conclude that the district court erred in dismissing the juror. The panel wrote that the district court's determination that the juror harbored "malice toward the judicial process" is not supported and cannot provide the basis for the juror's dismissal. The panel wrote that while the district court also cited the juror's alleged refusal to deliberate, the panel was firmly convinced there was a reasonable possibility that the juror's dismissal stemmed from her views on the strength of the government's prosecution. The panel based its decision on the specific and uncommon circumstances of this case, including the district court's decision to strike the juror, a former criminal defense lawyer, after receiving a complaint from other jurors and without clarifying the juror's alleged confusion about a jury instruction that applied to all charges; and that the district court removed the juror without giving the original jury any

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

further instructions or allowing it any further opportunity to deliberate. The panel recognized that the district court faced a trying situation with a hold-out juror after devoting many months to a taxing trial, but wrote that a single juror's ability to affect the outcome of a long-running prosecution is an inevitable possibility given the Sixth Amendment right to a unanimous jury verdict that criminal defendants are afforded.

## COUNSEL

Lisa A. Rasmussen (argued), Law Office of Lisa Rasmussen PC, Las Vegas, Nevada, for Defendant-Appellant.

William R. Reed (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; Nicholas A. Trutanich, United States Attorney; United States Attorney's Office, Reno, Nevada; for Plaintiff-Appellee.

## OPINION

BRESS, Circuit Judge:

We confront in this case the question whether a district court erred in dismissing a juror, hours into jury deliberations following a lengthy criminal trial. Dismissing a juror based on her views of the strength of the government's case is an intrusion on the jury's role and violates the Sixth Amendment. But though the decision must be made carefully, there are various reasons why a district court may properly, and in its discretion, remove a juror from service once the jury has begun deliberating. Determining whether such a dismissal was a violation of the

defendant's constitutional right to a unanimous jury verdict, or instead a permissible response to a juror's recalcitrance, bias, or incapacity, is a sensitive task. Because district courts observe jurors first-hand, they are accorded considerable deference in their handling of these issues.

Under the unique facts before us, however, and notwithstanding the substantial resources expended in this case, we are constrained to conclude that the district court erred in dismissing a juror. The district court's determination that the juror harbored "malice toward the judicial process" is not supported and cannot provide the basis for the juror's dismissal. And while the district court also cited the juror's alleged refusal to deliberate, based on the record in this case we are firmly convinced there was a reasonable possibility that the juror's dismissal stemmed from her views on the strength of the government's prosecution.

We base our decision on the specific circumstances of this case, which are uncommon and which this opinion will describe in detail. These include the district court's decision to strike the juror, a former criminal defense lawyer, after receiving a complaint from other jurors and without clarifying the juror's alleged confusion about a jury instruction that applied to all charges. The district court also removed the juror without giving the original jury any further instructions or allowing it any further opportunity to deliberate.

We recognize that the district court faced a trying situation with a hold-out juror after devoting many months to a taxing trial. But a single juror's ability to affect the outcome of a long-running prosecution is an inevitable possibility given the Sixth Amendment right to a unanimous jury verdict that criminal defendants are afforded. When that

right clashes with an interest in producing the result that most (but perhaps not all) jurors might reach, our law requires that the former must prevail. While the removed juror here may have disagreed with her peers on the strength of the government's case, that did not mean she thereby acted in bad faith.

Cases challenging the dismissal of a juror are classically fact-dependent. Our decision today is, and can only be, based on the unique combination of circumstances presented in this case. Although we do not do so lightly, we are compelled to vacate the defendant's convictions and sentence and remand for a new trial.

I

A

On October 28, 2015, a grand jury indicted Dr. Henri Wetselaar, a physician, and David Litwin, his "purported . . . medical assistant," on charges of conspiracy to distribute a controlled substance and eight counts of distributing a controlled substance. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(c), 846; 21 C.F.R. § 1306.04. Dr. Wetselaar was also charged with money laundering, 18 U.S.C. § 1957, and improperly structuring financial transactions, 31 U.S.C. §§ 5324(a)(3), (d)(1)–(2). Litwin was separately charged with three counts of making false statements to a government agency. 18 U.S.C. § 1001.

These charges arose from a lengthy law enforcement investigation into Wetselaar's Las Vegas-area medical practice. The investigation, which began in 2010 and included extensive use of undercover officers, revealed that Wetselaar was prescribing large quantities of powerful and addictive medications, such as Oxycodone and Xanax, often

on a cash basis, after perfunctory patient examinations. For a time, Wetselaar and Litwin also prescribed narcotics for cash to large groups of supposed patients who would visit private homes to meet with them.

Opening statements began on January 10, 2017. Due to Wetselaar's own health issues and his advanced age (he turned 93 years old during the trial), the trial was conducted only four days per week, stopping in the early afternoon each day. The government's evidence included recordings and testimony from undercover agents; testimony from "cappers" (individuals who posed as and recruited allegedly fraudulent patients to obtain prescriptions for drugs that were later sold on the street); and medical testimony regarding acceptable pharmaceutical prescribing practices. In their defense, Wetselaar and Litwin argued, among other things, that they issued the prescriptions in good faith; that they refused prescriptions to patients whose claims they doubted; and that patients' claims of subjective pain are difficult to disprove.[1]

B

Although many issues arose during trial and are presented on appeal, our focus is on the district court's dismissal of Juror 5.[2] To understand our holding and reasoning in this case, it is important to lay out in some detail

---

[1] The government also brought charges against a pharmacy manager, Jason Smith. The jury hung as to these charges and the district court granted Smith's post-trial motion for acquittal. Smith is not a party to this appeal.

[2] Juror 5 was originally known as Juror 6, but she became Juror 5 after another juror was excused. We will refer to her throughout this opinion as Juror 5.

the facts and circumstances that eventually led to Juror 5's dismissal. At times, this includes significant excerpts from the transcript of proceedings in the district court.

We first discuss Juror 5's *voir dire* and selection as a juror, which later became relevant to her removal from the jury. We then describe the issues that arose during jury deliberations and the district court's decision to dismiss Juror 5.

1

As part of the juror selection process, Juror 5 appeared for *voir dire* questioning on January 9, 2017. The questioning, which the district court conducted in the presence of counsel, revealed that Juror 5 had been a practicing attorney in her native Philippines for 22 years. Juror 5 estimated that half of her practice in the Philippines was criminal defense. The other half was civil work ("any civil matters"—"employment, labor, insurance"). For the previous fourteen years, Juror 5 had "worked in the legal profession" in Seattle and Las Vegas. At the time of *voir dire*, she was a paralegal at Hall Jaffe & Clayton LLP, a Las Vegas "insurance defense firm." No party moved to strike Juror 5.

The jury was empaneled this same day. After she was excused for the day, Juror 5 notified her law firm that she had been selected as a juror. That afternoon, Juror 5 sent an email to Denise Saavedra, the courtroom administrator, explaining that she could no longer serve as a juror. That email read as follows:

Ms. Saavedra,

I was selected as juror this morning in a case under Hon. Judge Kent Dawson. Upon our dismissal at past 1:00 pm, I immediately notified my employer (Hall Jaffe & Clayton LLP) about my selection as a juror. They have never had a case where a staff of the Firm has been selected as a juror (mine is the first time), hence there is **no policy in place regarding salary while serving jury duty**. After a brief meeting with the HR Department, I was advised just now – that they can only pay up to 2 weeks of absence by reason of my jury duty.

I cannot afford not to have my full salary for 4 weeks (after the 1st 2 weeks of paid jury duty). My significant other is retired without any significant income and relies on my regular income for our sustenance. Please relay to the Hon. Judge Dawson that while I wish to fulfill my civic duty, doing so will put me in financial distress.

I intend to see you tomorrow, or the Hon. Judge to explain my predicament – but I will not be able to sit in for the rest of the jury trial.

Sincerely,

[Juror 5]

(Emphasis in original).

The district court addressed Juror 5's email the next morning. After reading the email into the record, the district court informed counsel that it would decline Juror 5's request to be excused. The district court explained its reasoning as follows:

> My response to [Juror 5] is that her commitment to this case is 16 hours per week. That is two eight-hour days. If – if her employer will pay her for a full two weeks of salary, that means that it would be the equivalent of four weeks of jury time, if she doesn't work overtime or go in on weekends. I think she can do it. I'm not going to grant her request. I'm considering bringing in one of the partners of the firm, which has over 200 cases in federal court, and asking them if they're aware of this decision by the HR department, but in the meantime, my intention [is] to inform her that – that we can't release her because we will be down to two alternates before we come out of the gate.

No counsel objected to the court's proposed decision.

The court then brought in Juror 5 and explained its decision to her. The court expressed sympathy with the juror's situation and irritation with her employer, and had the following exchange with Juror 5:

> THE COURT: [Juror 5], I have received your e-mail that was sent to the courtroom administrator and while I sympathize with your situation with your employer, I cannot let you go based on that. Had we known of your situation, it is possible that you would

have been excused from service but now that we're underway and no way of getting additional jurors and we've had one juror drop out already this morning who's going to be brought in, either voluntarily or by the marshals we – we can't afford to lose another juror.

Your service is approximately 16 hours per week on the jury. If the – if your law firm is willing to pay you for your service up to two full weeks, then this would – that would cover you for four weeks of jury time, because you're only working a half a day here or serving a half a day here and you can go to work and do things there. Also, you have – you have the possibility of working a little bit into the evening. It would be a longer day for you, but I'm confident you can do it. Many of us, including the attorneys in this case, spend 12 hours a day working on – on matters related to this case. And, so, while I sympathize with your situation, I'm going to hold you to your service.

I would be happy to call in your firm. I'm, frankly, quite surprised that your firm, which has many cases pending in this Court, would not cover you for the full term of your service because I'm certain that they've requested juries and enjoyed the benefits of service by jurors much like yourself, but I – I don't want to call them in without alerting you that I would do that because I don't want

to place you in a bad situation with your employer.

Is there anything you would like to say?

JUROR NO. [5]: I do understand the situation, Your Honor. I deeply regret I am in this situation. I already told my employer I will do my best. Right after the hearing – the trial, when we are let go by 1:00 p.m. or thereabouts, that I will drive to the west and begin my work to cover whatever deadlines I have currently and that means working on or before 2 o'clock p.m. until whenever through the night.

THE COURT: Okay. Well, I hope that they'll accept that because it's illegal to discharge someone because they take jury service. So I hope we don't get to that point. I hope we don't get to the point where I need to call in the partners and have them stand down in front of the Court and the press and explain why they're not more conducive to jury service.

JUROR NO. [5]: I don't think so, Your Honor.

THE COURT: Okay.

JUROR NO. [5]: I think they do understand that they cannot do that –

THE COURT: All right.

JUROR NO. [5]: – or not to do that.  But I did offer my service to the firm right after my jury service and I think they're viewing that more kindly.

THE COURT: Okay.  Let me know if there's anything we can do –

JUROR NO. [5]: Yes, Your Honor. Thank you.

THE COURT: – to assist you in being treated appropriately.

JUROR NO. [5]: Thank you, Your Honor.

THE COURT: Thank you.

2

Opening statements began later that same day, on January 10, 2017.  The trial required 35 trial days over a period of over ten weeks.  Closing arguments concluded on the morning of March 22, 2017.  The case was submitted to the jury at approximately 9:40 a.m., and the jury began deliberating that morning.

That day, the court received two notes from the jury on different issues, including the proper interpretation of a jury instruction.  Approximately three hours into deliberations, at 12:51 p.m., the court received another written note signed by Juror 8.  The note read: "Jury cannot come to a decision.  We have a jur[or] that says no matter what, she will not change her mind."  The court informed counsel that it would

question Juror 8 to "attempt to determine whether this is a genuine disagreement or just a refusal to deliberate."

Once counsel returned to the courthouse, the court explained its proposed plan, noting that it would first speak with Juror 8 and then the juror who was the subject of the written note. Counsel assented to the plan. Juror 8 was then brought into the courtroom and informed the court that he had dictated the note to another juror to write, and that Juror 8 had then signed it. In response to the court's questioning, Juror 8 confirmed that Juror 5 had said "No matter what, she will not change her mind." Before proceeding further, the court "caution[ed]" Juror 8 that "I don't want you to tell me how the jury stands on the issue of the guilt or innocence on any of the counts. I don't want to hear that."

After some back and forth confirming that the juror in question was Juror 5, the court had the following exchange with Juror 8:

> THE COURT: … [I]s the juror in question making statements that would indicate that she has a prejudice that will not allow her to deliberate?
>
> JUROR NO. 8: I would say yes.
>
> THE COURT: Has she expressed – verbally expressed a prejudice, or are you just assuming there is one?
>
> JUROR NO. 8: I would almost have to assume it, but we tried multiple angles, and she says "No matter what."

THE COURT: Okay. Is she, in your opinion, refusing to listen to the evidence?

JUROR NO. 8: Yes.

THE COURT: Is she refusing to consider the evidence?

JUROR NO. 8: Yes.

THE COURT: Is she refusing to consider the views of her fellow jurors?

JUROR NO. 8: Yes.

THE COURT: Is she refusing to participate in deliberations?

JUROR NO. 8: Yes.

At this point, Wetselaar's counsel asked for a sidebar. While defense counsel "appreciate[d]" that the court was asking questions that paralleled the jury instructions, defense counsel expressed concern that "there's a leading nature to them," and suggested that the court ask more open-ended questions. The government opposed that suggestion because it could result in the court intruding on the jury's discussions. The court agreed: "That's my concern is if we try to get into what has happened in the three hours that the jury has been deliberating, blow by blow, we're going to unavoidably get into the discussions of the jurors." But the court explained it would "ask [Juror 8] to give me an example of anything she has said beyond what she has said already which is 'no matter what.'"

At this point, the court and counsel also recognized among themselves that the jury room was tense. Defense counsel remarked that "you can tell there's some emotion there." The court agreed: "It's highly volatile in there," and "that's been going on all day. You can hear the yelling."

After further discussions with counsel about how to conduct the questioning, the court resumed with Juror 8:

> THE COURT: … How early on in the deliberations did the juror state that she would not change her mind no matter what? Early?
>
> JUROR NO. 8: Very early.
>
> THE COURT: Okay. Was it before the jury considered the evidence; talked about the evidence?
>
> JUROR NO. 8: As the evidence was rolled in, after we had already started debating.
>
> THE COURT: Okay. And once the evidence came in, did the juror refuse to consider the evidence at all or did she consider it?
>
> JUROR NO. 8: She completely refused.
>
> THE COURT: In the outset?
>
> JUROR NO. 8: From the outset.

THE COURT:  Okay.  Anything else that you can tell us, without going into the detail of the deliberations?  You already said she stated she would not change her mind no matter what.

JUROR NO. 8:  Correct.

THE COURT:  Any other indications that – that she was refusing to consider the evidence or the views of her fellow jurors? Any other statements?

JUROR NO. 8:  She said it's her right to, and that no matter what we say or do, it's not going to change her mind.

THE COURT:  Has she expressed any views about the law or bias that would indicate an intent to nullify –

JUROR NO. 8:  She –

THE COURT:  – the law?

JUROR NO. 8:  She seems to be confused about one part on it.

THE COURT:  Okay.

JUROR NO. 8:  And we've attempted to explain it and read it to her several times.

THE COURT:  Okay.

JUROR NO. 8:  And she's getting stuck on one part of the sentence.

THE COURT:  All right.

JUROR NO. 8:  And not reading it as a whole.

THE COURT:  Okay.  With respect to – does that cover all – all of the charges or just one charge?

JUROR NO. 8:  All of the charges.

THE COURT:  All of the charges.  Okay.

JUROR NO. 8:  And I asked her that, too.

THE COURT:  Pardon?

JUROR NO. 8: I asked her that, too.

THE COURT:  Okay.

At this point, Wetselaar's counsel requested a sidebar and asked the court to inquire of Juror 8 what portion of the jury instructions was confusing Juror 5.  The government again objected because this would "delv[e] into the jury's conversations and deliberations," and the court agreed. Defense counsel then suggested that the court speak with other jurors.  Taking up the suggestion, the court asked Juror 8 to identify another juror who would not be too shy to speak to the court.  Juror 8 identified a few other jurors but also indicated that the court could speak to "pretty much almost any juror."

After further discussions with counsel, the court decided to speak with Juror 10. Juror 10 was brought into the courtroom and the court had the following exchange with her:

> THE COURT: Okay. I just want to ask you a few questions. We did receive the note from [Juror 8]. I'll read it to you. "Jury cannot come to a decision. We have a jury" – I am assuming that means juror – "that says no matter what, she will not change her mind." Did you hear that statement made?
>
> JUROR NO. 10: Yes, I did.
>
> THE COURT: Okay.
>
> JUROR NO. 10: I did.
>
> THE COURT: And it was early on in the deliberations?
>
> JUROR NO. 10: As soon as we sat down.
>
> THE COURT: Okay. Any – any participation by this juror in the deliberations?
>
> JUROR NO. 10: She doesn't want to listen or –
>
> THE COURT: And has she repeated that phrase more than once?
>
> JUROR NO. 10: Yes.

. . .

THE COURT: … Is the refusal to consult with the other jurors, to listen to the views of the fellow jurors, and to discuss fully? What is your opinion with respect to the conduct of this juror as this instruction that the Court read previously?

JUROR NO. 10: She just doesn't want to hear anybody else's opinions or statements or review anything.

THE COURT: All right. Okay. Thank you.

JUROR NO. 10: Okay.

After this exchange, defense counsel acknowledged that Juror 5 "does have a duty to deliberate," but argued that "the fact that she's not changing her mind, which is what these jurors seem to be saying, is not grounds to strike her." To this the court responded: "I realize that. But we are beyond that, because she's refusing to listen to the views of her fellow jurors, she's refusing to consider the evidence, she is refusing to discuss it fully, and she has had this approach since the very first time that the jury started to discuss the case."

At this time, the court then took the opportunity to "make a further record on this particular individual." The court then put the following statement on the record:

This individual, my recollection is that she's a paralegal working for a firm here in

Las Vegas. During the – during the first day of deliberations – of juror selection, after she had been selected, she checked with her firm, the firm that she is working for as a paralegal.

They informed her that she would not be paid for anything after the second week. She made very strenuous attempts to get out of jury service at that time. My belief, based on that and what I have heard now, is that she is sending a message to this Court about the inconvenience that she has suffered, the harm to her employment, and having to work extra hours to make up for her time away on jury service is a strong motive for what I am seeing now.

So, she did have an axe to grind. She does have an axe to grind. She made that very clear to myself and Miss Saavedra.

The court then addressed the courtroom administrator, Denise Saavedra:

[THE COURT]: And Miss Saavedra, do you agree with that?

COURTROOM ADMINISTRATOR: Yes, Your Honor.

THE COURT: Is there anything that you wish to add? Did you communicate those things to me?

COURTROOM ADMINISTRATOR: Yes. And one thing that she had mentioned

that struck me. She was going in immediately after work, working six to seven hours after here, after jury trial.

The court then decided to call Juror 5 in for questioning. Before this occurred, defense counsel expressed concern that Juror 5 may simply have a certain view of the evidence and the court should remind her of the instructions to deliberate and see if she is willing to abide by them. The court disagreed: "[M]y approach is going to be to ask her if she actually said these words and how many times she said them. And if she said that, then I don't need to go into these other things."

The court brought in Juror 5. The following colloquy ensued, which we reproduce in full:

> THE COURT: I have a few questions to ask you. And I don't want you to tell me how the jury stands on the issue of the innocence or guilt of any of the defendants on any of the charges, and I don't want you to discuss with me the details of any deliberations in court.

> JUROR NO. 5: I understand.

> THE COURT: All right. When I instructed you just before you went in to deliberate, I read an instruction to you. "When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in court." Do you remember that?

JUROR NO. 5: Yes, Your Honor.

THE COURT: "You will then discuss the case with your fellow jurors to reach agreement if you can do so."

JUROR NO. 5: Correct.

THE COURT: All right. Now, further on in the instructions, it states that you are to consider the weight and effect of the evidence. Do you remember that?

JUROR NO. 5: I do.

THE COURT: All right. "Discuss with your fellow jurors – discuss it fully with your fellow jurors," that is all of the evidence, "and listen to the views of your fellow jurors."

JUROR NO. 5: I do and I did.

THE COURT: All right. According to two of your fellow jurors – and I can call more in, if necessary – you made a statement, as soon as the jury sat down, after being given the directive to commence deliberations, that no matter what, you will not change your mind. Did you make that statement?

JUROR NO. 5: I did. And if I may have the –

THE COURT: Hold on a minute. How many times did you make that statement in the course of the deliberation?

JUROR NO. 5: It's over like five hours now, Your Honor.

THE COURT: It was – it was about three when we first started this. About three hours. How many times?

JUROR NO. 5: I probably would have said it three times.

THE COURT: Three times?

JUROR NO. 5: Two to three times.

THE COURT: So, no matter what, you would not change your mind?

JUROR NO. 5: No, Your Honor.

THE COURT: All right. When – when you were first selected as a juror, you talked to Miss Saavedra [the courtroom administrator] and informed her – and I believe that was probably in writing – that you would not be paid for anything after two weeks of jury service.

JUROR NO. 5: At that time, yes, Your Honor.

THE COURT:  All right.  And you asked to be excused as a juror.

JUROR NO. 5:  Correct.

THE COURT:  All right.  Now, when you discussed that with Miss Saavedra, you also informed her that you would have to be working after jury service into the evening six to eight hours to make up for your time off; is that right?

JUROR NO. 5:  Correct.

THE COURT:  All right.  You heard the instructions of the Court to deliberate and consider the evidence.  According to the other jurors, you have not done that from the outset. You announced from the outset that you would not change your mind on the issues period.  Do you agree that that happened?

JUROR NO. 5:  It did happen.

THE COURT:  All right.  Do you wish to be discharged from the jury?

JUROR NO. 5:  If that is the pleasure of the Court.

THE COURT:  No, I'm asking you.  I am asking you.   I can send it back for deliberations if you are willing to change what you have been doing and consider all the evidence, read the instructions of the law,

listen to the views of your fellow jurors, and try to reach a verdict. If you feel that that cannot be done, then I'm going to discharge you.

JUROR NO. 5: Can I ask you my understanding of what you just stated, Your Honor? If my understanding of what you stated is correct?

THE COURT: You may.

JUROR NO. 5: My understanding from your last statement is that if I am willing to go back there, review the evidence, discuss the evidence, listen to the views of the other jurors, and come up with a verdict, then you can send me back. Or, otherwise, you can dismiss my service right here, right now. Is that correct, Your Honor?

THE COURT: That's not exactly correct.

JUROR NO. 5: Okay. And you are asking me which –

THE COURT: Deliberate toward a verdict is what I asked you to do.

JUROR NO. 5: I am willing to do that. In fact, I have done that.

THE COURT: You have not. And using the words "I will not change my mind no

matter what," three times, you have not been doing that.

> JUROR NO. 5: If that statement makes that conclusion, then I apologize. But that is not the context. I mean, I – I would not want to debate with the Honorable Judge. I just wanted to put my – my – those three statements in the proper context, because that's not how we started.

> THE COURT: According to jurors – and I can ask other jurors.

> JUROR NO. 5: You don't have to, Judge.

> THE COURT: It was right from the get-go. Right from when you first sat down, you made that statement, and you acknowledged to me, when I questioned you, if that was true, and you said "Yes."

> JUROR NO. 5: I did acknowledge that those statements were made by me.

Defense counsel at this point requested a sidebar. Defense counsel argued that Juror 5 was implying that she had been deliberating and was simply unconvinced by the other jurors, and "wanted to put it in context and has not been able to provide the Court with that guidance." Defense counsel also argued Juror 5 should be allowed to return to the jury because she indicated "she'd be willing to agree to follow your admonition" and fulfill her duty to deliberate.

The district court disagreed: "I think it's a waste of time. That's my opinion based on what I have seen. Because when you announce from the get-go you are not going to consider any of the evidence or the views of your fellow jurors, to me that's – that's evidence of bias, and she should be discharged." Defense counsel asked for Juror 5 to be allowed to explain the "context" she referenced, but the court declined: "No, because then we get into the juror deliberations, and I'm sure she can point to something, somewhere, that will justify it. She's a paralegal. She knows what she's doing."

Over defense counsel's objection, the court then informed Juror 5 she had been discharged. The court then put the following oral findings on the record:

> The Court makes the following findings. This – the juror did not genuinely disagree with the – on the question of the decision of the jury, of the other jurors. She ignored the instruction to consider all the evidence, discuss it fully with the other jurors, listen to the views of fellow jurors.

> She admitted that at least three times she had made the statement that she would not change her mind on the issue no matter what, and one of those statements was made at the outset. She is a paralegal with many, many years of experience. She would obviously – if given the opportunity to explain, she would probably hang her hat on some point. She's savvy enough to do that.

> But her announcement from the get-go shows a bias that cannot be overcome by

sending her back with a simple agreement
that she will listen when she didn't before.

## C

The court dismissed the jury for the day, with deliberations resuming the next morning after an alternate juror was seated. The jury reached a verdict that afternoon. The jury hung on the counts against Smith, the pharmacy manager. *See ante* at 6 n.1. Wetselaar was convicted on all charges. Litwin was convicted of conspiracy and seven counts of unlawful distribution. But the jury acquitted Litwin on the three counts of making false statements to authorities and one count of distribution. The district court sentenced Wetselaar to 120 months imprisonment, and Litwin to 240 months. The district court also ordered forfeiture as to both defendants.

Wetselaar and Litwin filed a motion for a new trial based on, *inter alia*, the court's dismissal of Juror 5. The district court denied the motion. It explained that Juror 5 had been dismissed for good cause for two reasons: "(1) the juror refused to deliberate and; (2) the Court was concerned that the juror harbored at least some level of malice toward the judicial process and might not have been completely forthcoming with the Court due to the Court's refusal to dismiss the juror during jury selection." Noting that it had made efforts to avoid inquiring into jurors' views on the merits of the case, the court "confined its dismissal of the juror to her unwillingness to deliberate and her potential malice toward the judicial process."

## D

Wetselaar and Litwin appealed. Although the defendants raised various assignments of error, prior to

argument we issued an order directing the parties to focus their oral presentations on the dismissal of Juror 5. Most of the oral argument before us centered on that issue. After we heard argument, on March 24, 2020, we requested supplemental briefing from the parties on whether, assuming the district court erred in dismissing Juror 5, the error was structural error or subject to harmless error review.

On March 30, 2020, the district court *sua sponte* entered a minute order supplementing the record. That order reads in full as follows:

> This court received a Notice of Docket Activity filed March 24, 2020, wherein the Circuit Court ordered supplemental briefing from the parties on issues related to the dismissal of Juror No. 5. In reviewing chamber documents in this case, the court located emails from Juror No. 6, who later became Juror No. 5. These were found among notes and questions to the court from other jurors in this case. Such communications are considered administrative and not routinely made a part of the official record. The subject emails are attached, and the following will provide context to the dismissal of this juror.
>
> The subject emails from Juror No. 5 state that following her selection she learned that her employer would not pay her for jury service of more than 2 weeks. Her employer was a law firm that has been involved in hundreds of cases in federal court. It was suggested that in light of the short trial days, she work

with her employer to obtain a resolution. Before trial, the juror confirmed that she was available to serve as a juror for the length of time specified in her jury summons. She did not respond affirmatively to voir dire questioning concerning potential hardships of jury service, nor did she formally pursue additional relief thereafter. At the time of the request, the jury had been seated and the court was concerned about losing jurors due to an ongoing flu epidemic and the unpredictable events often associated with a lengthy trial. (The epidemic later actually became a problem for participants in the trial). What is also not apparent from the record is that the refusal of the court to dismiss her resulted in bitter and ongoing complaints from Juror No. 5 throughout the entire trial. Because the court does not interface directly with jurors except on the record, this information was being relayed to the court by the courtroom administrator. The overwhelming weight of the evidence supporting a finding of guilt, along with her express refusal to participate in deliberations, resulted in the ultimate finding that the juror was not acting in good faith and needed to be dismissed.

> Court personnel are prepared to provide
> further information in sworn declarations as
> deemed necessary.[3]

## II

We now turn to our analysis of the district court's
dismissal of Juror 5, beginning with the legal principles that
govern our review.   Under Federal Rule of Criminal
Procedure Rule 23(b)(3), "[a]fter the jury has retired to
deliberate" the court may dismiss a juror for "good cause."
Under that standard, it is well established that "a court may
not dismiss a juror during deliberations if the request for
discharge stems from doubts the juror harbors about the
sufficiency of the evidence." *United States v. Symington*,
195 F.3d 1080, 1085 (9th Cir. 1999) (quoting *United States
v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)).

The basis for this understandable limitation is the Sixth
Amendment's right to a unanimous jury verdict.   "In all
criminal prosecutions," the Sixth Amendment guarantees the
right to trial "by an impartial jury."  U.S. Const. amend. VI.
As the Supreme Court explained just this Term, "[w]herever
we might look to determine what the term 'trial by an
impartial jury trial' meant at the time of the Sixth
Amendment's adoption—whether it's the common law,
state practices in the founding era, or opinions and treatises
written soon afterward—the answer is unmistakable.  A jury
must reach a unanimous verdict in order to convict." *Ramos*

---

[3] On April 24, 2020, Dr. Wetselaar passed away.  We thus dismissed
Dr. Wetselaar's appeals and remanded to the district court with
instructions to vacate the judgment and dismiss the indictment as to
Wetselaar. *See, e.g.*, *United States v. Oberlin*, 718 F.2d 894, 895 (9th
Cir. 1983).  Only Litwin's appeals remain before us.

*v. Louisiana*, 140 S. Ct. 1390, 1395 (2020); *see also* Fed. R. Crim. P. 31(a) ("The verdict must be unanimous.").

Because a jury must be in universal agreement to convict, it does not take much to see that removing a juror merely because she disagrees with her fellow jurors on the proper outcome of the case would provide an obvious end-run around the unanimous jury verdict guarantee. If a juror could be removed on this basis, "then the right to a unanimous verdict would be illusory." *Brown*, 823 F.2d at 596. "A discharge of this kind would enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case. Such a result is unacceptable under the Constitution." *Id.*; *see also United States v. Christensen*, 828 F.3d 763, 807 (9th Cir. 2015); *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997). We have thus explained that when faced with a juror who refuses to agree with other jurors about the strength of the government's case, the court has two options: "declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Symington*, 195 F.3d at 1085–86 (quoting *Brown*, 823 F.2d at 596).

There are, of course, many situations where this core Sixth Amendment right is not implicated because the juror is removable for reasons that have nothing to do with her views on the case. Sickness or family emergencies are obvious examples. *United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007). In addition, "[c]ourts have also found 'just cause' to dismiss jurors who, although available and physically capable of serving, are nonetheless found to be unable to perform their duties properly." *Thomas*, 116 F.3d at 613.

Blatant juror misconduct is one example of a situation that plainly justifies dismissing a juror. *See*, *e.g.*, *Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 954 (9th Cir. 2018) (juror made violent threats to another juror); *United States v. McGill*, 815 F.3d 846, 868–69 (D.C. Cir. 2016) (per curiam) (juror properly discharged after "remov[ing] case-related notes from the jury room in violation of the court's instructions"); *Vartanian*, 476 F.3d at 1098–99 (juror contacted defendant and his family and lied about it to court).

An inability or unwillingness to follow the law is another prototypical instance in which a juror may be permissibly removed without offending the Sixth Amendment. *See, e.g.*, *United States v. Decoud*, 456 F.3d 996, 1003–05, 1017 (9th Cir. 2006) (juror requested dismissal because her religious beliefs prevented her from applying the law). As we have explained, "[a] juror's intentional disregard of the law, often in the form of juror nullification, can constitute good cause for dismissal of the juror." *Christensen*, 828 F.3d at 806.

More difficult situations arise when the basis for a juror's dismissal treads closer to the merits of the case. And the most difficult of these scenarios may well be a juror's alleged failure to deliberate. If a juror has reached a decision, at what point is potential unwillingness to alter that position a failure to deliberate as opposed to a reflection of the juror's sincerely held view of the evidence presented? Is a perceived disinterest in entertaining the views of other jurors a refusal to follow the jury instructions or merely an expression of disagreement with the opinions of fellow jurors? Gauging the extent of an impasse becomes only more difficult in the tinderbox of the jury room, where frayed nerves and passionate views can cause persons of good faith to doubt the sincerity of those with whom they

disagree.  As we have recognized, disagreements on the merits can "certainly manifest themselves in concerns about a juror's reasonableness or general capacity as a juror." *Symington*, 195 F.3d at 1088; *see also United States v. McIntosh*, 380 F.3d 548, 556 (1st Cir. 2004) ("[W]hether a juror is refusing to deliberate or has simply reached a conclusion contrary to the other jurors is a question of exquisite delicacy.  The line between the two can be vanishingly thin.").

Our cases recognize that district courts operate on the front lines in this difficult space between trial management and protection of a defendant's Sixth Amendment rights. This important task is complicated by the imperative that courts "not delve deeply into a juror's motivations" and thereby "intrude on the secrecy of the jury's deliberations." *Symington*, 195 F.3d at 1086 (quoting *Brown*, 823 F.2d at 596).  But while district courts cannot pry into the jury's discussions—and we acknowledge that the district court in this case made a careful effort to avoid doing so—district courts, unlike appellate courts, are able to observe jurors in person.  We therefore "'generally defer to the district court's good cause determinations' because 'the district court is in the best position to evaluate the jury's ability to deliberate.'" *Christensen*, 828 F.3d at 808 (quoting *Vartanian*, 476 F.3d at 1098).

Our cases set forth legal standards to govern district courts in their decisions whether to dismiss a juror for good cause.  Given the need to avoid "delving into the juror's views on the merits of the case," *Symington*, 195 F.3d at 1087, we have held that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."  *Christensen*,

828 F.3d at 807 (quoting *Symington*, 195 F.3d at 1087). This means that "the available evidence must be 'sufficient to leave one firmly convinced that the impetus for a juror's dismissal is unrelated to his or her position on the merits.'" *Id.* (quoting *Symington*, 195 F.3d at 1087 & n.5) (alterations omitted).

In deference to the district court's superior vantage point, we review the district court's dismissal of a juror during deliberations for abuse of discretion. *Id.* at 806. Factual findings are reviewed for clear error. *Id.* Under our cases, "[t]he decision to excuse a juror is committed to the district court's discretion and we must affirm unless we are left with the definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors." *Id.* (quoting *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998)).

We applied these legal principles in one of the leading cases in this area, *United States v. Symington*, 195 F.3d 1080 (1999). In *Symington*, several days into deliberations following a long and complex trial, the court received a jury note complaining that "[o]ne juror has stated their final opinion prior to review of all counts." *Id.* at 1083. The court reinstructed the jury on its duty to deliberate. *Id.* Four days later, the jury sent another note to the court explaining that it had been trying to continue, but the same juror (Cotey) refused to discuss her views. The other jurors believed for various reasons that Cotey lacked the "ability to comprehend and focus" on the discussion. *Id.*

The court questioned each member of the jury. Some of this testimony indicated that Cotey "appeared confused and unfocused during deliberations." *Id.* But other testimony indicated that Cotey "seems to have her mind set [and] says she doesn't have to explain herself to anybody" and "just

kept getting stuck on two elements." *Id.* at 1084. Another juror complained that "[w]e are blocked and blocked and blocked." *Id.* Cotey testified that she was willing to continue deliberating and discuss her views but became intimidated by demands to justify her positions. *Id.* The district court dismissed Cotey, finding good cause because Cotey was "either unwilling or unable to participate in the deliberative process." *Id.* An alternate juror was seated, and the jury returned its verdict two weeks later. *Id.*

We reversed. We noted it was "undisputed" that "if the other jurors did seek to remove Cotey because they disagreed with her views on the merits," then the juror's dismissal "was improper." *Id.* at 1085. We held that "[w]hile there may have been some reason to doubt Cotey's abilities as a juror, there was also considerable evidence to suggest that the other jurors' frustrations with her derived primarily from the fact that she held a position opposite to theirs on the merits of the case." *Id.* at 1088. We recognized that "because the district court properly avoided compromising the secrecy of the jury's deliberations, the evidence available to the district court was necessarily limited." *Id.* at 1088 n.7. But we concluded that the conviction could not stand because "the district court could not have been 'firmly convinced' that the impetus for Cotey's dismissal was unrelated to her position on the merits of the case." *Id.*

## III

We now turn to whether the district court in this case reversibly erred in dismissing Juror 5. Given the legal standards we have set forth above, district courts' decisions to excuse jurors have been upheld in various circumstances. *See, e.g.*, *Christensen*, 828 F.3d at 813–14; *Decoud*, 456 F.3d at 1017; *Beard*, 161 F.3d at 1194. But as

*Symington* demonstrates, while district courts of necessity have leeway in how they approach juror dismissal issues, because defendants have a Sixth Amendment right to a unanimous jury verdict, "[t]he district court's discretion in this area is not unbounded." *Symington*, 195 F.3d at 1085. Courts, including ours, have thus reversed convictions where the record indicated an unacceptable risk that a juror was dismissed for reasons stemming from her views on the case. *See id.* at 1088; *Thomas*, 116 F.3d at 625; *Brown*, 832 F.2d at 599–600.

The district court here provided two bases for dismissing Juror 5: (1) her "potential malice toward the judicial process;" and (2) "her unwillingness to deliberate." Notwithstanding the deferential standard of review that we must apply, neither of the district court's rationales supported the dismissal of Juror 5. While no single fact is determinative, based on the unique combination of circumstances of this case, we are firmly convinced that the record "discloses [a] reasonable possibility that the impetus for [the] juror's dismissal stems from the juror's views on the merits of the case." *Christensen*, 828 F.3d at 807 (quoting *Symington*, 195 F.3d at 1087 n.5) (emphasis omitted).

## A

### 1

We begin with the district court's apparent finding that Juror 5 refused to deliberate because she harbored at least some "potential malice toward the judicial process." As we recounted above, after the district court learned that the jury's note concerned Juror 5, and before hearing from Juror 5 herself, the court drew a connection between Juror 5's conduct in jury deliberations and her earlier attempt to be

excused from jury duty. At that point in the proceedings, the district court elected to make a "record on this particular individual." The court stated that based on Juror 5's "very strenuous attempts to get out of jury service at that time," "[m]y belief . . . is that she is sending a message to this Court about the inconvenience that she has suffered," and that Juror 5 had "an axe to grind" with the court. In its order denying defendants' motion for a new trial, the court expanded on this point further. It explained that it dismissed Juror 5 in part because she "harbored at least some level of malice toward the judicial process" based on the court's earlier decision that she would not be excused from jury service due to her employer's policies.

It is true that bias is a permissible ground on which to dismiss a juror. *See, e.g.*, *Christensen*, 828 F.3d at 808, 812 n.25 (upholding dismissal of juror who stated that "witness[es] never tell the truth" and "if the federal government charges someone, they're innocent"); *United States v. Kemp*, 500 F.3d 257, 272–73 (3d Cir. 2007) (upholding dismissal of juror who stated that "[t]he government lies," "[t]hey always lie," and "Prosecutors and FBI agents are liars"). Sometimes this bias is manifested in a refusal to apply the law, also known as jury nullification. *See, e.g.*, *United States v. Oscar*, 877 F.3d 1270, 1288 (11th Cir. 2017) (juror admitted she "was not following the law" because "she believed that there's something . . . very wrong about the system") (alterations and internal quotation marks omitted); *Thomas*, 116 F.3d at 614 ("[The district court] identified a different form of bias as the primary ground for dismissing Juror No. 5—one arising not from an external event or from a relationship between a juror and a party, but rather, from a more general opposition to the application of the criminal narcotics laws to the defendants' conduct.").

In this case, however, no juror reported that Juror 5 made comments indicative of a bias against the judicial process. In fact, when the district court asked Juror 8 (the originator of the note) if Juror 5 had "expressed any views about the law or bias that would indicate an intent to nullify . . . the law," Juror 8 did not identify any such views. Instead, Juror 8 responded that Juror 5 "seems to be confused about one part" of the jury instructions and was "getting stuck on one part of the sentence."

When the district court questioned Juror 5, there was likewise no suggestion that Juror 5 made comments reflective of a bias against the court. In response to the district court's questions, Juror 5 acknowledged she had sought relief from jury duty months earlier because of her employer's policy to pay only two weeks' salary during her jury service. Juror 5 also acknowledged, again in response to the district court's questioning, that when she had previously sought dismissal from jury service shortly after *voir dire*, she informed Ms. Saavedra, the courtroom administrator, that she would need to work six to eight hours a day "to make up for [her] time off."

In this colloquy with the court Juror 5 agreed that she had previously requested dismissal due to her employer's policies. Effectively, Juror 5 acknowledged what is likely true of many jurors serving in protracted trials like this one: that Juror 5 had other obligations outside of trial, so that jury service was a significant imposition on her life. We recognize that the district court had a superior vantage point, but the court's findings give us very little to go on. The transcript does not show a potential malice toward the judicial process, or one that overcomes Juror 5's repeated statements indicating her willingness to continue deliberating.

We can, of course, readily accept that a district court could dismiss a juror based on circumstances indicating a likely bias, regardless of whether a juror makes a comment reflective of bias. *See, e.g.*, *United States v. Egbuniwe*, 969 F.2d 757, 761 (9th Cir. 1992) (affirming district court's dismissal of juror where the district court "determined that the juror could no longer be fair and impartial after he was informed during jury deliberations of alleged police misconduct involving his girlfriend"); *Thomas*, 116 F.3d at 621 (explaining that a bias can be discerned when "an event or relationship itself becomes the subject of investigation"). A juror's mere say-so that she is not biased would not preclude her dismissal on this ground if the facts and circumstances otherwise pointed to a bias that would impede a juror's faithful service. *Egbuniwe*, 969 F.2d at 762.

But even reviewing for abuse of discretion, we cannot conclude on the available record that Juror 5 harbored "at least some level of malice" toward the judicial process and was not "completely forthcoming" due to the district court's months-earlier determination that Juror 5 would not be excused from jury service. The district court linked Juror 5's conduct during jury deliberations to her request to be dismissed as a juror, but we can see nothing in the record of the two-month trial that suggests an ongoing bias against the court. The district court's theory that Juror 5 maintained a malice that she then acted upon some months later once the jury retired to deliberate therefore lacks support in the record.

2

We briefly consider the *sua sponte* minute order that the district court issued on March 30, 2020. The district court issued the minute order in response to an order we issued after oral argument requesting that counsel file supplemental

briefs addressing whether the erroneous dismissal of a juror constitutes structural error or error that should be reviewed for harmlessness.

The district court's minute order attached emails relating to Juror 5's request to be released from jury service; the substance of these emails was already in the record. The order also stated that the court's earlier refusal to dismiss Juror 5 resulted in Juror 5 making "bitter and ongoing complaints . . . throughout the entire trial," but that this was "not apparent from the record." To that end, the district court's minute order suggested that court personnel could provide further information in sworn declarations for our consideration. In context, the order seems to suggest declarations providing additional descriptions of Juror 5's demeanor or complaints made throughout the course of the trial, which would expand upon the court's reasons for deciding that Juror 5 was not acting in good faith and needed to be dismissed.

In very limited situations, Federal Rule of Appellate Procedure 10(e) allows district courts to correct or modify the record on appeal. This is not one of those circumstances. *See United States v. Garcia*, 997 F.2d 1273, 1278 (9th Cir. 1993) (explaining that Federal Rule of Appellate Procedure 10(e) cannot be used "to supplement the record with material not introduced or with findings not made"). The proffered new declarations would be created more than three years after the fact, and with no opportunity for the defendant to meaningfully respond. Any consideration of such declarations would pose serious due process concerns. We therefore decline to consider the additional description of the trial court proceedings contained in the minute order.

B

We turn next to the district court's second stated ground for dismissing Juror 5: that Juror 5 "did not genuinely disagree" with other jurors and "refused to deliberate" with them.  At least in its written order denying defendants' request for a new trial, the district court treated Juror 5's alleged failure to deliberate as a ground for her dismissal that was independent of Juror 5's asserted "malice" toward the judicial process—a ground we have held is not supported in the record.

It is not clear these two grounds can be so easily separated.  After learning from other jurors about the difficulties in the jury room and before it heard from Juror 5, the district court "ma[d]e a further record on this particular individual."  The court at this point connected Juror 5's prior effort to be excused from jury service to her alleged failure to deliberate: "My belief, based on that and what I have heard now, is that she is sending a message to this Court about the inconvenience that she has suffered, the harm to her employment, and having to work extra hours to make up for her time away on jury service is a strong motive for what I am seeing now."  Juror 5 was not deliberating, in other words, because she had "an axe to grind" with the court.  In its oral ruling dismissing Juror 5, the court similarly explained that Juror 5's "announcement from the get-go" that she had made up her mind "shows a bias that cannot be overcome."

Even so, treating the "failure to deliberate" finding as a separate ground for removal, we confront the question of whether Juror 5 refused to deliberate or whether her dismissal stems from her views on the merits of the case. Here, the record clearly discloses a "reasonable possibility that the impetus for [Juror 5's] dismissal stems from [her]

views on the merits of the case." *Christensen*, 828 F.3d at 807 (quoting *Symington*, 195 F.3d at 1087) (emphasis omitted).

1

We begin by considering perhaps the most powerful evidence supporting Juror 5's dismissal: the testimony of Jurors 8 and 10 that Juror 5 would not engage in the deliberative process. In response to the court's questions, Juror 8 confirmed that Juror 5 was "refusing to consider the evidence," "refusing to consider the views of her fellow jurors," and "refusing to participate in deliberations." Juror 10 similarly stated that Juror 5 "doesn't want to listen" and "doesn't want to hear anybody else's opinions or statements or review anything."

As we look further through the record, however, we see contrary evidence indicating a reasonable possibility that the jury's impasse may have stemmed from competing interpretations of a jury instruction or from Juror 5's views of the merits of the case. *See Symington*, 195 F.3d at 1087–88. We begin with the jury's note itself, which stated that the "Jury cannot come to a decision. We have a jur[or] that says no matter what, she will not change her mind." The district court in its order denying defendants' motion for a new trial explained that this "note raised legitimate concerns that the juror was refusing to deliberate and was unwilling or unable to participate in rational discussions regarding the evidence and the legal standard."

We agree the jury's note raised legitimate concerns that required further inquiry. But the note appeared to convey that the jury had a disagreement about the case itself, because the note said the jury "*cannot come to a decision*" and "no matter what" a juror "will not change her mind."

(Emphasis added).  As we have recognized, "[t]he dynamics of the jury process are such that often only one or two members express doubt as to [a] view held by a majority at the outset of deliberations." *United States v. Lopez*, 581 F.2d 1338, 1341 (9th Cir. 1978) (Kennedy, J.).  In this case, the jury had deliberated for three hours before sending its note about being unable to "come to a decision," and by that point the jury had already sent two other notes to the court indicating that jurors were seeking guidance on the applicable legal standards.

In addition to the text of the jury's notes, when the district court asked Juror 8 if Juror 5 had "expressed any views about the law or bias that would indicate an intent to nullify . . . the law," Juror 8 instead responded that Juror 5 "seems to be confused about one part of it."  According to Juror 8, although other jurors had "attempted to explain it and read it to her several times," Juror 5 was "getting stuck on one part of the sentence" and "not reading it as a whole." Juror 8 further confirmed that Juror 5's issue applied to all charges, and that Juror 8 had "asked her that, too."

The district court did not follow up with Jurors 5 or 8 to find out what jury instructions were "confus[ing]" Juror 5. The court also did not take up defense counsel's request to ask Juror 5 about the "context" she repeatedly referred to when she apologized to the court and tried to explain her statement that she would not change her mind "no matter what."

We do not fault the district court for its efforts to steer clear of the jury's view of the evidence.  The district court was required to avoid prying into the substance of the jury's discussions, and it had to take care to avoid a line of questioning that could reveal the contents of the jury's secret deliberations.  *See Symington*, 195 F.3d at 1086; *Brown*,

823 F.2d at 596. Whether or not there was a way for the district court to thread this needle here, the district court was not expected to undertake that potentially difficult task.

At the same time, however, Juror 8's description about Juror 5's contrary interpretation of a jury instruction cannot be ignored. The district court did not address this issue in explaining its decision to dismiss Juror 5. But Juror 8's statement on this score is important. Jurors' discussions about the language of jury instructions occur in the context of considering the case and measuring the evidence against the instructions. *E.g.*, *Boyde v. California*, 494 U.S. 370, 381 (1990) (noting that "[d]ifferences among [jurors] in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial"). Discussions of this nature, at bottom, center on whether the government has met its burden of proof. *See Symington*, 195 F.3d at 1084 (complaints that juror "'kept getting stuck on two elements'" indicated that other jurors' frustrations "may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views"). Nor was there a suggestion that Juror 5 was engaged in nullification of the law.

Juror 8's description of Juror 5's alleged confusion about a jury instruction also highlights that Juror 5 was deliberating to some extent. For Juror 8 to be able to describe Juror 5 "getting stuck on one part of a sentence" and being "confused about one part" of the instructions, there had to have been some amount of discussion with Juror 5. And although Juror 10 indicated that Juror 5 stated she would not change her mind as soon as the jury began deliberating, Juror 8 somewhat differently reported that

Juror 5 stated her position "[a]s the evidence was rolled in, after we had already started debating." Indeed, Juror 8 explained that other jurors had "tried multiple angles" with Juror 5, again indicating some amount of discussion with her.

The district court in questioning Juror 5, and in its later oral ruling dismissing her, seemed to draw dispositive significance from the fact that the jury's note said Juror 5 would not change her mind "no matter what," as well as Juror 5's admission that she had made this statement two or three times early in deliberations. To the extent the district court treated Juror 5's statements as reflecting "potential malice toward the judicial process," this lacks support for the reasons stated above. Moreover, given the text of the jury's note and Juror 8's testimony about discussions with Juror 5 concerning a jury instruction, the statement that a juror will not change her mind "no matter what" is one that, on this record, reflects ambiguity. *Compare McIntosh*, 380 F.3d at 551, 556 (affirming a district court's decision not to remove a juror after juror stated, *inter alia*, "that nobody is going to change his mind"), *with Symington*, 195 F.3d at 1083–84 (reversing dismissal of juror where other jurors had reported the dismissed juror conveying that she had "her mind made up" and had "her mind set"), *and Thomas*, 116 F.3d at 611 (reversing dismissal of juror who stated that "'he would not change his mind'"). Indeed, Juror 8 reported that Juror 5 said it was "her right" not to change her mind.

We recognize that Jurors 8 and 10 both stated that, in their view, Juror 5 was not considering the evidence and not considering the views of her fellow jurors. But based on the record as a whole, there remains "a reasonable possibility that [Juror 5's] views on the merits of the case provided the impetus for" the jury's note and Juror 5's ultimate removal.

*Symington*, 195 F.3d at 1088; *see also McGill*, 815 F.3d at 869 (explaining that a perceived refusal to deliberate can pose "inherent potential for confusion with a juror's evidence-based inclination to acquit"); *Thomas*, 116 F.3d at 611 (reversing district court's dismissal of a juror where juror had stated, *inter alia*, "'that he would not change his mind'" and where juror note had cited the dismissed juror's "predisposed disposition").

Juror 5 asked for an opportunity to give "context" for her statement that she was not going to change her mind no matter what, and apologized if that statement implied an unwillingness to deliberate. The district court did not allow Juror 5 to explain herself and was clearly trying to avoid delving into the jury's deliberations. But in its oral ruling dismissing Juror 5, the district court referenced Juror 5's legal experience and stated: "She is a paralegal with many, many years of experience. She would obviously – if given the opportunity to explain, she would probably hang her hat on some point. She's savvy enough to do that." Earlier in the proceedings, the district court similarly stated: "I'm sure she can point to something, somewhere, that will justify it. She's a paralegal. She knows what she's doing."

These were not sufficient grounds for declining to give the jury a further opportunity to continue deliberating, including with re-instructions as necessary. Where the jury had deliberated only about three hours, where Juror 5 had stated she was willing to continue deliberating, and given the record as a whole, which includes Juror 5's alleged confusion over a jury instruction, the district court was premature in concluding that sending the jury back to deliberate would be "a waste of time."

2

Relying on our decision in *Christensen*, the government points to the comparatively limited amount of jury deliberation that took place here.  Specifically, the government points out that in *Christensen*, we distinguished *Symington* in part based on the length of time the jury had been deliberating there before problems arose.  *See Christensen*, 828 F.3d at 811.  In *Christensen*, we thus explained that "[t]he longer period of time in *Symington* is consistent with a juror attempting to engage in deliberations on the merits but unable to convince his or her cohort."  *Id.* Conversely, we noted, "one hour is unlikely to have been enough time for the jurors to have ascertained such a difference in their views on the evidence."  *Id.*   The government thus urges that because jurors here only deliberated for three hours before sending a note complaining about Juror 5, the note did not stem from a disagreement about the case itself.

*Christensen*, however, was a very different case.  It involved a juror who made numerous "anti-government" statements, called the government's case "a joke," and then lied to the court about whether he had made these statements to other jurors.  *Id.* at 809–12.  There are no analogous circumstances like that here.  Moreover, while *Christensen* observed that a lengthier deliberation period can be indicative of a disagreement among jurors on the merits of the case, *id.* at 811, *Christensen* did not create a bright-line rule allowing jurors to be dismissed so long as the jury had only been deliberating a short time.  While a longer period of discussion may be "consistent with" a disagreement on the weight of the evidence, *id.*, a shorter period of discussion is not necessarily inconsistent with that either, particularly

given the intensely fact-dependent nature of juror dismissal cases.

Our holding in this case accords with the three leading cases involving the most comparable facts: our decision in *Symington*, and the decisions in *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997), and *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987).  In these cases, courts of appeal each held, based on the distinct records before them, that district courts reversibly erred in dismissing a juror after deliberations had begun.  *See Symington*, 195 F.3d at 1088; *Thomas*, 116 F.3d at 625; *Brown*, 832 F.2d at 599–600.

In addition, in *Symington*, *Thomas*, and *Brown*, there were strong counter-narratives indicating that the impetus for the jurors' dismissals stemmed from reasons other than the jurors' views on the merits.  In *Symington*, there was a substantial record supporting the juror's incoherence and inability to understand the proceedings.  195 F.3d at 1083; *see also id.* at 1093–97 (Fitzgerald, J., dissenting).    In *Thomas* and *Brown*, there was substantial record evidence suggesting that the juror was unwilling to follow the law, *i.e.*, jury nullification.  *See Thomas*, 116 F.3d at 611, 614–17; *Brown*, 823 F.3d at 594–95.  And yet the courts in all three cases held that the dismissals of the jurors were improper because of the reasonable possibility that the dismissals instead stemmed from the jurors' views on the strength of the government's case.  *See Symington*, 195 F.3d at 1088; *Thomas*, 116 F.3d at 625; *Brown*, 832 F.2d at 596–97.  In this case, by contrast, the identified alternative explanation for Juror 5's claimed failure to deliberate—Juror 5's "malice" toward the court—is lacking.

IV

Having determined that the dismissal of Juror 5 during deliberations was error, we turn to the question of the appropriate remedy. The defendant argues that the improper removal of Juror 5 was structural error, requiring automatic reversal of his convictions and vacatur of his sentence. *See, e.g.*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006); *Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993). The government, by contrast, argues that the court should evaluate whether the error was harmless.

No party has identified a case in which a court has delved into the question whether the improper dismissal of a juror during deliberations is structural error or subject to harmless error review. In cases where this error was held to have occurred, the convictions were reversed without discussion. *See Symington*, 195 F.3d at 1088; *Thomas*, 116 F.3d at 606, 625; *Brown*, 823 F.2d at 597; *see also United States v. Matthews*, 709 F. App'x 481, 482 (9th Cir. 2018); *United States v. Tabacca*, 924 F.2d 906, 915 (9th Cir. 1991) (reversing convictions after determining district court improperly proceeded without a juror who became unavailable during deliberations).

Assuming the government is correct that Juror 5's dismissal is susceptible to harmless error review, we cannot find the error harmless. *See Beard*, 161 F.3d at 1195 (declining to decide whether district court's improper substitution of alternate jurors was structural error or subject to harmless error review because even if the latter could apply, "[i]t has not been shown that the error was harmless").

Because this is constitutional error, the government bears the burden of demonstrating the error "was harmless beyond a reasonable doubt." *Chapman v. California*,

386 U.S. 18, 24 (1967); *see also, e.g.*, *United States v. Velarde-Gomez*, 269 F.3d 1023, 1034–35 (9th Cir. 2001) (en banc). Under this standard, "[t]he question a reviewing court must ask is this: absent [the error] is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting*, 461 U.S. 499, 510–11 (1983); *see also, e.g.*, *United States v. Bustamante*, 687 F.3d 1190, 1195 (9th Cir. 2012).

We do not lightly remand this case, and we are mindful of the expense and inconvenience that retrial will require. Nevertheless, on this record we cannot conclude that the district court's error was harmless beyond a reasonable doubt. The government presented compelling evidence that Litwin engaged in the charged conduct, including testimony from eyewitnesses and undercover agents. But Litwin also presented defenses, particularly as to his lack of criminal intent, and there was at least some evidence to support them. In fact, the jury ultimately acquitted Litwin of some of the charges. And as explained above, there is also reason to believe Juror 5 had views on the merits of the case. Even though the government's case-in-chief was strong, Litwin was entitled to a fair trial consistent with the Sixth Amendment.

Because the record lacks sufficient support for the district court's assessment of Juror 5's willingness and ability to deliberate, we vacate the district court's judgment and remand for further proceedings. Given the entirety of the record discussed above, and again assuming that the issue is amenable to a harmlessness analysis, the government has not demonstrated beyond a reasonable doubt that the result would have been the same had Juror 5 not been dismissed.

We vacate defendant's convictions and remand for a new trial.  We do not reach defendant's other assignments of error.

**VACATED AND REMANDED.**