**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 51136**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: June 25, 2025** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) |
| STACIE NICHOL FITZPATRICK, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cynthia Yee-Wallace, District Judge.

Judgment of conviction for possession of a controlled substance, possession of drug paraphernalia, and being a persistent violator, <u>vacated</u> <u>and</u> <u>case</u> <u>remanded</u>.

Erik R. Lehtinen, State Appellate Public Defender; Sally J. Cooley, Deputy Appellate Public Defender, Boise, for appellant. Sally J. Cooley argued.

Hon. Raúl R. Labrador, Attorney General; Elizabeth Estess, Deputy Attorney General, Boise, for respondent. Elizabeth Estess argued.

_____

LORELLO, Judge

Stacie Nichol Fitzpatrick appeals from her judgment of conviction for possession of a controlled substance, possession of drug paraphernalia, and being a persistent violator. For the reasons set forth below, we vacate Fitzpatrick's judgment of conviction and remand the case.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

An officer initiated a traffic stop after witnessing a vehicle fail to make a complete stop before exiting a parking lot. The officer identified Fitzpatrick as the driver of the vehicle. While the officer was completing the citation for the traffic offense, a canine unit arrived at the scene with a drug dog, which conducted a drug-detection sniff of the vehicle. During the sniff, the drug dog touched his nose on both "the front driver's side and passenger's side of the vehicle."

1

Ultimately, the drug dog alerted to the presence of narcotics in the vehicle. A subsequent search of the vehicle yielded methamphetamine and drug paraphernalia.

The State charged Fitzpatrick with possession of a controlled substance (I.C. § 37-2732(c)), possession of drug paraphernalia (I.C. § 37-2734A), and a sentencing enhancement (I.C. § 37-2739). Fitzpatrick filed a motion to suppress the evidence found in the vehicle, arguing the evidence was obtained in violation of her Fourth Amendment rights because the drug dog trespassed when it made physical contact with the vehicle. The district court held a hearing on Fitzpatrick's motion to suppress, at which it considered the canine-unit officer's testimony and bodycam video. Ultimately, the district court denied the motion, finding that the drug dog "had already given a general alert that he was detecting the odor of drugs to the source" before making physical contact with the vehicle. As a result, the district court concluded that the officers had probable cause to search the vehicle prior to the drug dog's nose touching both the front driver's side and passenger's side doors.

The case proceeded to trial. During jury deliberations, the district court received a note indicating that one of the jurors (Juror No. 9) appeared unwilling to cooperate. The district court questioned Juror No. 9 on the concerns raised about her ability and willingness to participate in deliberations. Based on Juror No. 9's answers, the district court determined the juror was unwilling to deliberate and that her ability to remain fair and impartial had been compromised. As a result, the district court found good cause to excuse Juror No. 9. The State agreed with the district court's decision but Fitzpatrick did not. Fitzpatrick voiced concerns that the jury was simply deadlocked and asked the district court to inquire whether additional deliberations might help the jury reach a decision. The district court noted Fitzpatrick's objections, denied the request to inquire of the jurors, and emphasized Juror No. 9's comments as to her willingness and ability to deliberate. As a result, the district court excused Juror No. 9 based on its good cause finding. The following day, an alternate juror joined the jury, which was instructed to begin its deliberations anew. Approximately two hours later, the jury returned a guilty verdict on both counts. The district court entered a judgment of conviction and sentenced Fitzpatrick.[1]

---

[1]     Following the guilty verdicts, Fitzpatrick pled guilty to the sentencing enhancement. The district court found a factual basis for Fitzpatrick's guilty plea to the "information part II" (the sentencing enhancement). We note, however, that the judgment of conviction, which we vacate

Following the jury's verdict and sentencing, Fitzpatrick filed a motion for a new trial, arguing the district court abused its discretion by excusing the juror, which Fitzpatrick argued deprived the juror of "a fair expression of opinion." Fitzpatrick further asserted that the district court "misdirected the jury in a matter of law" when the district court excused the juror and "restarted the jury deliberations anew with the alternate juror." The district court held a hearing and denied Fitzpatrick's motion, concluding that neither the juror's excusal nor the subsequent jury instructions misdirected the jury. Fitzpatrick appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

The decision whether a juror can render a fair and impartial verdict is directed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Abdullah*, 158 Idaho 386, 421, 348 P.3d 1, 36 (2015); *State v. Yager*, 139 Idaho 680, 688, 85 P.3d 656, 664 (2004). However, whether a criminal defendant's constitutional rights to a fair and impartial jury is a question of law reviewed de novo. *See State v. Rockstahl*, 159 Idaho 364, 369, 360 P.3d 373, 378 (2015).

When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently

on other grounds, indicates an enhancement for being a persistent violator pursuant to I.C. § 19-2514, which was not charged in the information.

with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

III.

ANALYSIS

Fitzpatrick contends the district court erred in denying her motion to suppress, asserting the finding that there was probable cause to search her vehicle prior to the drug dog's trespass is not supported by substantial evidence. Fitzpatrick also argues the district court abused its discretion in excusing the juror from deliberations and in denying her motion for a new trial. The State responds that the record and applicable law support the district court's findings and conclusions. We hold that Fitzpatrick has failed to show the district court erred in denying her motion to suppress. We further hold that the district court erred in finding good cause to excuse the juror.[2]

**A.      Motion to Suppress**

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches are presumed to be unreasonable and, therefore, violative of the Fourth Amendment. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995). A reliable drug dog's sniff of the exterior of a vehicle is not a search under the Fourth Amendment and does not require either a warrant or an exception to the warrant requirement. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

Article I, Section 17 of the Idaho Constitution, similarly provides that:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.

The automobile exception to the warrant requirement allows police to search a vehicle without a warrant when there is probable cause to believe the vehicle contains contraband or evidence of a crime. *United States v. Ross*, 456 U.S. 798, 823-24 (1982). Probable cause is established when the totality of the circumstances known to the officer at the time of the search

---

[2]      Because we hold that the district court erred in finding good cause to excuse the juror and remand on that basis, we need not address Fitzpatrick's argument that the district court erred in denying her motion for a new trial.

4

would give rise--in the mind of a reasonable person--to a fair probability that contraband or evidence of a crime will be found in a particular place. *State v. Anderson*, 154 Idaho 703, 706, 302 P.3d 328, 331 (2012). Probable cause is a flexible common-sense standard, requiring only a practical, nontechnical probability that incriminating evidence is present. *Id.* Further, probable cause deals with the factual and practical considerations on which reasonable and prudent persons act. *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *State v. Williams*, 162 Idaho 56, 66, 394 P.3d 99, 109 (Ct. App. 2016).

In *Florida v. Harris*, 568 U.S. 237 (2013), the United States Supreme Court noted that evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust the dog's alert and that, if a bona fide organization has certified a dog after testing the dog's reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. *Id.* at 246-47. Finally, the Court in *Harris* ruled that, if the State has produced proof from controlled settings that a dog performs reliably in detecting drugs and the defendant has not contested that showing, then the court should find probable cause. *Id.* at 248.

In *State v. Howard*, 169 Idaho 379, 384, 496 P.3d 865, 870 (2021), the Idaho Supreme Court recognized the distinction between a drug dog's general alert behavior and the dog's trained final indication. *Id.* The Court noted that the absence of a final indication is not *ipso facto* an absence of probable cause. *Id.* The Court also noted the testimony of the dog's handler is important for proving a dog's general alert to establish probable cause. In *State v. Randall*, 169 Idaho 358, 369, 496 P.3d 844, 855 (2021), the Idaho Supreme Court stated the drug dog handler's testimony was necessary "to explain why [the dog's] behavior was an objectively reliable indication that narcotics were present." *Id.*; *see also United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013) (holding that "evidence from a trained and reliable handler about alert behavior he recognized in his dog can be the basis for probable cause"); *Howard*, 169 Idaho at 384, 496 P.3d at 870 (explaining that, "without objective evidence bearing on the reliability of [the dog's] behavior before his trained alert, we are left with little more than our intuition about the significance of that behavior"). Other courts that have addressed general alerting prior to final indication focus on the dog's behaviors, such as the dog's breathing, posture, and body movements when the dog is sniffing a vehicle. *See, e.g.*, *United States v. Holleman*, 743 F.3d 1152, 1154 (8th

5

Cir. 2014) (noting dog stopped "dead in his tracks" and began "to really detail the area"); *Thomas*, 726 F.3d at 1087 (noting the "dog's tail and ears went up, his posture and breathing pattern changed, and he started 'air-scenting'"); *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009) (noting dog alerted on the driver's side front door and the alert was evidenced by the dog stiffening his body, breathing deeply, and attempting to jump into the window); *cf. Harris*, 568 U.S. at 240 (noting drug detection dog alerted by "signaling, through a distinctive set of behaviors, that he smelled drugs" at the driver's side door). These signals are different than the final indication, which may include a dog sitting, lying down, or otherwise pointing to the odor's strongest source.

In *State v. Ricks*, 173 Idaho 74, 77, 539 P.3d 190, 193 (Ct. App. 2023), this Court held that "language in *Randall* and *Howard* indicates the Idaho Supreme Court would adopt a rule allowing for probable cause based on a dog's general alert and despite the absence of a dog's final indication." *Ricks*, 173 Idaho at 77, 539 P.3d at 193. We concluded that a dog's signaling behavior of a general alert--such as the dog's breathing, posture, body movements, and verbal responses--can constitute probable cause. *Id.* at 79, 539 P.3d at 195.

On appeal, Fitzpatrick contends the district court's findings that the drug dog was "in odor"[3] and provided a "general alert" prior to touching Fitzpatrick's vehicle are not supported by substantial evidence. According to Fitzpatrick, the drug dog's behavior while "in odor" failed to establish probable cause because the circumstances surrounding the general alert "indicated he was exhibiting reward seeking behavior, and not a trained dog's sniff search." Fitzpatrick contends that, because the drug dog was not following his training and was instead "cheating the system to get a treat," the district court erred in concluding probable cause existed to search Fitzpatrick's vehicle. We disagree.

The district court reviewed the video evidence and the canine unit officer's testimony in concluding that the drug dog's behavior indicated the presence of controlled substances. According to the district court, the canine unit officer's testimony was credible and consistent with

---

[3]    The district court used the phrase "in odor" to refer to the drug dog "using his nose to pursue an odor he is trained to detect, to the source of that odor." Additionally, the district court noted the canine unit officer used "the phrase 'sourcing odor' or 'sourcing the odor' to refer to the same behavior and/or when [the drug dog] is following a scent cone."

6

the bodycam video recording. During the suppression hearing, the district court noted that the total hours the canine unit officer had spent with the drug dog "is in the thousands," which led to the canine unit officer becoming "in tune with [the drug dog's] changes in behavior." The canine unit officer trained with the drug dog "for 160 hours in drug detection, among other training, including four hour-long weekly trainings with other handlers." Additionally, the district court recognized that the drug dog "is trained to detect marijuana, cocaine, heroin, and methamphetamine and is consistent in sniffs involving drug detection." The district court emphasized that Fitzpatrick failed to challenge the drug dog's reliability and evaluated the drug dog's "consistent alerting process when he detects the odor of an illegal drug." Specifically, the district court found that, once the canine unit officer gives a command:

> [The drug dog] exhibits being in odor or "sourcing an odor," by quickly pulling toward the vehicle, closing his mouth, engaging in rapid sniffing and directing and concentrating that rapid sniffing toward the odor, touching his nose to the source of odor, or in close proximity to the source, and then giving a final alert, which is a head snap and holding his position.

The district court determined that, during the free-air sniff, the drug dog "exhibited behavior that he was already in odor before his final alerts." Based on the canine unit officer's testimony and bodycam video, the district court found that the drug dog followed the alerting process. As part of this alerting process, the drug dog's nose touched the vehicle twice--once on the front driver's side before the first final alert and again on the front passenger's side before the second final alert. According to the district court, each instance in which the drug dog touched his nose to the front driver's side and passenger's side doors constituted a search. However, the district court found that, before the drug dog's nose made contact with the vehicle prior to his first final alert, his behavior--"quickly pulling on the leash toward the vehicle, closing his mouth while engaging in rapid sniffing, and directing and concentrating his rapid sniffing toward the vehicle"--indicated he was "in odor." This, according to the district court, constituted a "general alert that provided probable cause for each search in this case." As a result, the district court determined "probable cause was objectively established prior to [the drug dog's] nose touching the vehicle on both the front driver's side and passenger's side of the vehicle." We agree that, based on the district court's factual findings, there was substantial evidence to support the probable cause finding.

7

Fitzpatrick's challenges to the canine unit officer's bodycam video do not change this conclusion. Fitzpatrick contends the bodycam video did not provide objective indicia of reliability to "lend credence to his subjective belief that [the drug dog] had detected the odor of narcotics." According to Fitzpatrick, the video shows that the drug dog had "been conditioned to alert, creating a Pavlovian response rather than a reliable sniff." While Fitzpatrick contends the video evidence "does not reflect the concentrated rapid sniffing described" by the canine unit officer's testimony, Fitzpatrick's argument is a general disagreement that the behaviors relied upon by the district court provided probable cause prior to the trespass. Moreover, Fitzpatrick does not challenge the district court's factual findings. Instead, Fitzpatrick recounts the canine unit officer's process of readying the drug dog prior to the sniff and asserts the video evidence does not capture "the intense and rapid sniffing described by" the canine unit officer. That Fitzpatrick does not believe the bodycam video conclusively shows the drug dog exhibiting behaviors described by the canine unit officer, which provided probable cause prior to the trespass, does not undermine the district court's probable cause determination. The canine unit officer's testimony established the significance of the drug dog's behaviors prior to any trespass, which the district court determined established general alerts and provided probable cause prior to both instances of trespass.

The district court correctly found that the canine unit officer's bodycam video and testimony supported a finding of probable cause to search Fitzpatrick's vehicle prior to the drug dog's trespasses. Fitzpatrick has failed to show the district court erred in denying her motion to suppress.[4]

**B.     Removal of Juror No. 9**

At the close of the evidence, the jury retired to deliberate. Approximately three and a half hours into deliberations, the presiding juror sent the following note to the district court:

> Juror [No.] 9 chooses to withhold judgment based on prior experiences and disdain for comments made during deliberation by another juror. Based on comments made by Juror [No.] 9, any consensus is impossible due to perceived coercion. Juror

---

[4]     Fitzpatrick also argues that this Court's decision in *Ricks* is "contrary to controlling case law and should be abrogated in favor of a bright-line rule requiring a final, trained alert." We have previously been asked to overrule *Ricks* and have declined to do so. *See State v. Scheid*, ___ Idaho ___, 567 P.3d 798 (Ct. App. 2025); *State v. Morgan*, ___ Idaho ___, 565 P.3d 275 (Ct. App. 2025). We continue to adhere to those decisions today.

[No.] 9 has stated that they do not want to be here and the rest of the jury should make the decision so they can leave.

The district court called Juror No. 9 into the courtroom and asked her to explain the circumstances surrounding the presiding juror's note. The discussion went as follows:

[COURT]:     So, I got a note from the presiding juror and it indicated that you are--that you're not willing to participate in the jury deliberations. Tell me where you're at. And don't tell where the jury stands or how you're voting--

[JUROR]:     Okay, okay.

[COURT]:     --or where you're at on issues, but just tell me where you personally are at in terms of your participation or whether or not you're still willing to participate in the deliberations.

[JUROR]:     I think there's some conflict of personalities--

[COURT]:     Okay.

[JUROR]:     --and pressure from that--

[COURT]:     Okay.

[JUROR]:     --that I'm not comfortable with. Does that make sense?

[COURT]:     Yes.

[JUROR]:     Okay.

[COURT]:     The impression that I got from the note was that--it says, "Juror [No.] 9 chooses to withhold judgment." So, I kind of--I got the impression that you--and that Juror [No.] 9 did not want to be here and wanted the rest of the jury to make the decision.

Do you feel at this point like you are willing and want to continue to participate, or where are you at in terms of that?

[JUROR]:     I don't think that my participation is going to get them where they want to be.

[COURT]:     But is it that you're unwilling to participate? Or you're willing to participate, you just think you can't influence or change their mind?

[JUROR]:     No, no. I'm not trying to influence or change their mind at all.

[COURT]:     Okay. Okay.

[JUROR]:     I feel pressured to change my mind--

[COURT]:     Okay.

[JUROR]:     --by certain things that are happening.

[COURT]:     Okay. Are you willing to continue to participate and deliberate, or at this point is that--would that be a no?

[JUROR]:     Probably a no.

[COURT]:     Okay.

[JUROR]:     If I--if--you know.

[COURT]:     It's okay.

[JUROR]:     But I feel terrible.

9

[COURT]: Don't feel terrible. This honestly--so you know, Instruction Number 21, I do instruct the jurors that they have a duty to consult with one another and deliberate.

[JUROR]: Right.

[COURT]: And so, if you, for whatever is--I--no judgment whatsoever. If you are unwilling to participate, that's fine. I just need to know that.

[JUROR]: Okay.

[COURT]: Is that where you're at?

[JUROR]: Yeah. Probably.

[COURT]: Okay. Because if that's the case, then do you think that might affect your ability to be fair and impartial?

[JUROR]: Yeah.

[COURT]: Okay. Okay. I understand. So don't feel bad.

[JUROR]: Right.

[COURT]: I--this happens. I thank you for being honest and letting us know that.

Following this exchange, the district court offered both the State and Fitzpatrick the opportunity to question Juror No. 9 and both parties declined. After Juror No. 9 left the courtroom, the district court informed the parties of its intent to excuse Juror No. 9 for good cause due to her unwillingness to deliberate. The State agreed with the district court's analysis and decision; Fitzpatrick disagreed.

According to Fitzpatrick, Juror No. 9's answers indicated she held a minority view during deliberations and that she was "someone who has an opinion, who is standing by her opinion, and is not letting others run over her or push her to" change her mind. Fitzpatrick asserted that the concerns raised about Juror No. 9 and her answers to the district court's questions suggested Juror No. 9 was experiencing undue pressure and exemplified a deadlocked jury--not a juror unwilling to participate in deliberations. Fitzpatrick urged the district court to ask the jury whether further deliberations could help it reach a decision. If the jury answered "no" Fitzpatrick argued, it would indicate a hung jury. After noting Fitzpatrick's objections, the district court emphasized Juror No. 9's assertions that she was not willing to participate in further deliberations and that she was not able to remain fair and impartial. The district court therefore found good cause to excuse Juror No. 9 based on the presiding juror's note and Juror No. 9's answers to its questions. The following day, an alternate juror was seated, and the jury was instructed to begin deliberations anew. After

10

deliberating for approximately two hours, the jury returned a guilty verdict for each count and Fitzpatrick subsequently pled guilty to the sentencing enhancement.

On appeal, Fitzpatrick argues the district court abused its discretion in denying Fitzpatrick's request to inquire whether the jury believed it could reach a unanimous verdict after further deliberations. Fitzpatrick also contends the district court erred in "failing to recognize that [Juror No. 9] was voicing a minority opinion, and in dismissing her and empaneling an alternate in her place."[5] We hold that the district court erred in finding good cause to excuse Juror No. 9.

First, with respect to Fitzpatrick's argument that the district court should have inquired of the jury regarding the prospect for unanimity, Idaho appellate courts have not yet addressed the specific scenario presented in this case. However, precedent supports the general proposition that a trial court may poll jurors upon being notified of the jury's difficulty in reaching a unanimous decision. *See State v. Flint*, 114 Idaho 806, 813, 761 P.2d 1158, 1165 (1988) (holding that prohibition on the use of dynamite instructions does not restrict a trial court from "polling the individual jurors, and depending on the responses and appearances, then when appropriate guiding them toward another appropriate period of deliberation," assuming the "jurors do not declare themselves deadlocked"); *State v. Pullin*, 152 Idaho 82, 86, 266 P.3d 1187, 1191 (Ct. App. 2011) (concluding no error by the district court asking the jury to "go back in there and visit a minute [to] consider" the options presented for further deliberations after receiving a note from the jury indicating it could not come to a unanimous decision); *State v. Timmons*, 141 Idaho 376, 377-78, 109 P.3d 1118, 1119-20 (Ct. App. 2005) (holding that the district court did not err in asking whether additional deliberations might help the jury reach a unanimous verdict and directing the jury to continue its deliberations after a juror asked what would happen if the jury only reached a verdict on one of two counts).

---

[5]     Fitzpatrick also asserts that the district court erred in concluding that Juror No. 9's answers to the district court's questions "rose to the level of bias that warranted her dismissal" from the jury under I.C. § 19-2019(2). Fitzpatrick did not challenge Juror No. 9's removal pursuant to I.C. § 19-2019(2) below. As such, the district court did not make a finding as to Juror No. 9's alleged bias pursuant to I.C. § 19-2019(2). Consequently, Fitzpatrick's argument is unpreserved for appeal and we need not address this assertion further. *See State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992) (holding that issues not raised below may not be considered for the first time on appeal).

Decisions from other jurisdictions offer additional guidance. *See United States v. Symington*, 195 F.3d 1080, 1083 (9th Cir. 1999) (noting the trial court questioned each juror individually after members of the jury expressed their concerns that one of the jurors allegedly struggled to stay focused, refused to discuss her views, and that the majority of the jury questioned her ability to comprehend the information being discussed); *United States v. Thomas*, 116 F.3d 606, 611 (2nd Cir. 1997) (noting the trial court conducted in camera, on-the-record interviews with each juror after it received a note indicating the jury was unable to reach a verdict due to one juror's "predisposed dispositions")*; United States v. Brown*, 823 F.2d 591, 595 (D.C. Cir. 1987) (noting the trial court questioned a juror after he sent a note indicating he was not able to discharge his duties as a member of the jury). In these cases, the courts expressed concern that inquiries into a juror's ability or willingness to fulfill his or her duties risked violating the sanctity of jury deliberations. The Second Circuit noted that "courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial." *Thomas*, 116 F.3d at 618. This undertaking becomes "particularly sensitive where, as here, the court endeavors to investigate allegations of juror misconduct during deliberations." *Id*. Nevertheless, nothing forecloses the district court from making a *limited* inquiry in order to determine whether a jury is deadlocked or whether further deliberations could be constructive. The inquiry should be limited because "no one-including the judge presiding at a trial has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror"--the "secrecy of deliberations is essential to the proper functioning of juries." *Id.*

Notwithstanding whether further inquiry of the jury as a whole or individual polling of the jurors was an option in order to assess whether additional deliberations would have been productive in this case, the district court did not do so. Instead, the district court limited its inquiry to asking Juror No. 9 about the presiding juror's allegation that Juror No. 9 refused to reach a "consensus" with the other jurors. This inquiry relates to Fitzpatrick's second argument that there was an insufficient basis to exclude Juror No. 9 for cause. We agree there was an insufficient basis to do so.

We begin our good cause analysis with a discussion of the Second Circuit's opinion in *Thomas*, which we find instructive on this issue. In *Thomas*, a series of concerns regarding a particular juror were communicated to the court both during trial and during deliberations. In both

instances, the court conducted in-camera interviews of all jurors to assess the circumstances surrounding the complaints about the juror. Although the court declined to remove the juror after the first round of inquiries (which occurred during trial), the court did remove the juror after the inquiries related to complaints about the juror's behavior during deliberations. The general nature of the complaints during deliberations were that the juror had a "predisposed disposition" and that the juror was not willing to change his mind; some jurors also indicated the juror was disruptive. *Thomas*, 116 F.3d at 611. However, one juror indicated that the "friction among the jurors had been 'pretty well ironed out,'" and another indicated that the other jurors were in fact 'picking on'" the juror about whom others complained. *Id.* Overall, the jurors expressed differing opinions on the reasons the juror "was unyielding in favor of acquittal." *Id.* Ultimately, the court removed the juror, finding the juror was a "distraction," a "'focal point' for the jury's attention" whose removal would facilitate deliberation, and "was ignoring the evidence in favor of his own, preconceived ideas about the case." *Id.* at 612. As to the latter finding, the Second Circuit's review focused on whether the juror was engaged in nullification, i.e., a refusal to follow the law and the court's instructions, which would warrant a finding of just cause for removal. The Second Circuit concluded the evidence was insufficient to support such a finding. In reaching this conclusion, the Second Circuit adopted and applied the rule set forth in *Brown*, 823 F.2d at 596, that, "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Thomas*, 116 F.3d at 621-22. The Second Circuit stated that this rule applies in any case "where the juror allegedly refuses to follow the law--whether the juror himself requests to be discharged from duty or . . . fellow jurors raise allegations of this form of misconduct." *Id.* at 622. The Second Circuit reasoned:

> Consider a case where, for example, a strong majority of the jury favors conviction, but a small set of jurors--perhaps just one--disagrees. The group of jurors favoring conviction may well come to a view the "holdout" or "holdouts" not only as unreasonable, but as unwilling to follow the court's instructions on the law. The evidentiary standard that we endorse today . . . serves to protect these holdouts from fellow jurors who have come to the conclusion that the holdouts are acting lawlessly.
> This evidentiary standard protects not only against the wrongful removal of jurors; it also serves to protect against overly intrusive judicial inquiries into the substance of the jury's deliberations. A presiding judge faced with anything but

13

unambiguous evidence that a juror refuses to apply the law as instructed need go no further in his investigation of the alleged nullification; in such circumstances, the juror is not subject to dismissal on the basis of his alleged refusal to follow the court's instructions.

*Id.* (footnote omitted).

The Second Circuit was also careful to note that courts must also, in all cases, guard against the removal of a juror "who aims to follow the court's instructions" based on his view of the merits of a case." *Id.* at 622 n.11. "Accordingly, if the record raises any possibility that the juror's views on the merits of the case, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed." *Id.*

We now turn to the facts of this case. The presiding juror's note indicated that Juror No. 9 was "choos[ing] to withhold judgment based on prior experiences and disdain for comments made during deliberation by another juror," "consensus [was] impossible due to [Juror No. 9's] perceived coercion," and that Juror No. 9 did not want to deliberate further. When Juror No. 9 was asked whether she was "willing" or "want[ed]" to participate in further deliberations, she said that she felt "pressure" she was not "comfortable with," including "pressure" to "change [her] mind," and that she did not "think that [her] participation [was] going to get them where they want to be." The district court then asked Juror No. 9 whether her "unwilling[ness]" to "participate" "might affect [her] ability to be fair and impartial." Juror No. 9 answered "[p]robably" and "[y]eah" to these questions. In our view, this is insufficient evidence to support excusing Juror No. 9 because the record discloses a possibility that the complaints about and the request to discharge Juror No. 9 was a result of her view of the sufficiency of the State's evidence against Fitzpatrick. This possibility is most evident in Juror No. 9's responses reflecting that she felt pressure to change her mind, which is corroborated by the presiding juror's reference to "perceived coercion," as well as Juror No. 9's statement that she did not think her participation was "going to get [the other jurors] where they want to be." Because the record raises the possibility that the conflict between Juror No. 9 and the other jurors was based on Juror No. 9's view of the merits of the case, rather than an intent to disregard the court's instructions (including any instructions regarding the duty of jurors), it was error to dismiss Juror No. 9. Under the circumstances of this case, the district court should have instead either "sen[t] the jury back to continue deliberating or

14

declare[d] a mistrial." *Symington*, 195 F.3d at 1087. Accordingly, the district court erred in dismissing Juror No. 9 in this case.

## IV.
## CONCLUSION

The district court's conclusion that the canine unit officer's bodycam video and testimony supported a finding of probable cause to search Fitzpatrick's vehicle prior to any trespass by the drug dog is supported by substantial evidence. As a result, Fitzpatrick has failed to show the district court erred in denying her motion to suppress. However, the district court erred when it found good cause to excuse Juror No. 9 based on the presiding juror's note that a verdict was not possible because of Juror No. 9 and her statements to the district court that she felt pressured by the other jurors to change her mind. Consequently, we vacate Fitzpatrick's judgment of conviction for possession of a controlled substance, possession of drug paraphernalia, and being a persistent violator and remand the case to the district court.

Chief Judge GRATTON and Judge HUSKEY, **CONCUR**.